Welcome to Denver. This is an expedited appeal of Alaska v. the Department of Education. And I think the courtroom deputy has told you that we're going to allow 20 minutes per side since this is our only case and we've got plenty of time. So we'll start with that. The clock inevitably will now fail sometime during this, but we'll keep track of things and we'll be somewhat flexible. Mr. Huron will wave at you or stand up or say something if the clock breaks and give fair warnings. So with that, let's get started. This case is 24-3089, State of Alaska v. Department of Education. And Mr. Brewer for the department, you may go first. May it please the court, Simon Brewer for the Department and the Secretary of Education. I'd like to reserve four minutes for rebuttal. Three decades ago, Congress provided for income contingent repayment of federal direct student loans. These plans are based on two core principles that Congress enacted into the text of the statute. The first is that payments are based on a borrower's income. This means that for some persistently low-income borrowers, they will not be able to repay the entire balance of a loan over the lifetime of the loan. The second principle is that no borrower will be required to make payments in perpetuity. Instead, Congress capped the length of the repayment term at 25 years. Since 1993, every income contingent repayment plan offered by the department has complied with those two principles, and the SAVE plan is based on those same two principles. Accordingly, the report erred in adjoining parts of the SAVE plan. What's been happening after 25 years since we have these? Are the borrowers' debt forgiven, or do they go into default, or is there a combination of those remedies? In every income contingent repayment plan ever offered, there has been a loan forgiveness component at the end of the borrower's repayment term. No borrower has ever been required to go into default or anything like that following the end of their repayment term under these plans. The SAVE plan, in that sense, is a continuation of the same core features that every income contingent repayment plan has included. I am very concerned about whether there's anything we can do to help this in light of the Eighth Circuit entering a universal injunction. In your supplemental brief, you say, all this court can do is create confusion by disagreeing with the Eighth Circuit, but nothing this court says or does can displace the Eighth Circuit's injunction. Do you agree with that statement? I believe that's the state's supplemental brief, Your Honor. Yours says something similar. It says that the Eighth Circuit has entered a conflicting order and because of its universal scope, it nullifies our stay order. That's correct, right? That's correct, Your Honor. Well, let me ask you this. Do we, as the Tenth Circuit, have any power to dissolve the universal injunction entered by the Eighth Circuit? No, Your Honor, but the Department has applied to the Supreme Court to vacate the injunction. And they do have some power over this issue, but I, for the life of me, cannot understand how there is anything we can do that has any impact in the real world. Two responses, Your Honor. So the first is that the fact that another court has entered a conflicting injunction should not be a way to insulate the district court's injunction here from review. Well, it should not be, but it is. I mean, you read, I mean, Justice Gorsuch, I think, wrote a very good, I think it was a concurrence, I can't remember, but explaining the problem with universal injunctions. And basically, you get a district court somewhere in the And everybody else's hands are tied because the order wasn't limited to the parties before that particular court. That's exactly what we have here. That is, of course, a correct understanding of the problem with universal injunctions, and that's one of the reasons the Eighth Circuit erred. But I don't think that that should... We can't decide the Eighth Circuit erred. No, but Your Honors can decide that the district court here erred. And reversing the preliminary injunction will ensure that if the Supreme Court vacates the Eighth Circuit injunction, then the department is not enjoined from implementing the statement. So it has no impact in the real world, but hypothetically, in the future, depending on what the Supreme Court does, it might. I don't think it's right that it has no impact on the real world. It ensures that there is review of the district court's injunction as it was entered at the time that the district court acted. And the fact that the department has subsequently taken compliance measures to comply with a different injunction is not part of the record on which the district court's injunction here is reviewed. Surely, it's in the record, or at least it's public information we can take judicial notice of. I certainly have no objection to Your Honors' understanding that the Eighth Circuit has issued this injunction. But when this court reviews a preliminary injunction issued by a district court, it reviews whether the district court acted properly at the time that the injunction issued. So at the time that injunction was issued, there was no Eighth Circuit opinion? Exactly right, Your Honor. I have another jurisdictional question as well. I'm troubled about how the states could have any case or controversy involving them where relief could be granted. Because they're saying we could lose our money from these loan agreements, but the loan agreements are specifically giving the students the power to stop at any time. And they don't, in other words, the states do not have a legal right to continue those loan agreements. That's exactly right. So, and the state's brief, the quote right at the beginning of some language that a, one of the requirements is that there be a legal right. And there isn't. So how do they have standing to even address the issue? That's exactly right, Your Honor. The states lack standing for the reasons you articulated. To have an Article III injury in fact, the plaintiffs must allege, in the words of Lew But the states have no legally protected interest in future interest payments under these federal family education loans following the repayment in full of those loans. And that's exactly what happens when a borrower consolidates. What was the basis of the district courts finding that there'd be at least $100,000 of financial effect to Alaska? The Alaska Declaration says that Alaska stands to lose $100,000 in interest. But it makes no effort to establish that Alaska is entitled to such interest following the consolidation of resources. That was the problem I noticed in all the briefing. Yes, they could lose it, but they don't have a legal right not to lose it. Exactly. They entered into a contract that could be terminated. That was their legal right. So somebody says, I'm going to exercise that right, I'm going to terminate it. They have that right, there's no cognizable injury that we can grant any relief on. There's no cognizable injury. And that particular argument, I didn't see foreclosed by any of our precedent. The other cases in the Supreme Court that address this issue talk about, oh, they could lose a lot of money and so forth, and therefore you have standing. But I did not see anywhere that any Supreme Court or Tenth Circuit case addressed the problem that they don't have a right to the continuation of these plans at all. Exactly right, Your Honor. And it would be truly remarkable if a plaintiff could assert standing on the theory that it is injured when a loan is repaid in full. According to the right of the lender or the borrower. Exactly. And because federal law here specifically provides borrowers the right to accelerate the payment of those loans at any time when they make those consolidation payments, they have fully fulfilled their obligations to the lenders under this. So we have two jurisdictional concerns, the one that Judge McHugh raised, and the one that you and I have been talking about. Why don't we go to the merits? On the merits, Your Honor, the district court recognized that the SAVE plan is authorized by the plain text of the Higher Education Act. And that's right for the reasons that I articulated in my opening statement. It complies with those two core principles that Congress enacted into the text. How do you square that statement, though, with the difference between the income contingent plans and the income-based plans? The income-based repayment plan clearly statutorily authorizes loan forgiveness in hardship and for public service. But the income contingent plan does not. It's silent as to that. Given that Congress said it in one place and not in the other, that's kind of the core of my concern about the major question doctrine. What's your response to that? So I want to start with the text, Your Honor, and then I'll come back to the major questions doctrine. So as to the text, I don't agree that the statute is silent. The statute provides for forgiveness by enacting this cap on the length of time. Your Honor, can you put this, to answer the question in a helpful way, what are we talking about in terms of the provisions? Are you looking at the entire SAVE plan? Are you looking only at the provisions enjoined by the district court here? I had understood Judge Timkovich's question to be specifically about the forgiveness, the shortened timeline to forgiveness, which was not one of the provisions enjoined by the district court. I would be glad to address the other contested questions. No, I just want to make sure I understood what we're talking about. But that issue, I mean, I've been troubled by that. I originally thought when we did it with the preliminary injunction that we were limited to the small issue being raised by the Department of Education. But we've got a cross appeal by the state that puts everything else at issue as well. So don't we have the entire regulation before us now? Yes, Your Honor. You have all three of the provisions that have been specifically contested by the state. And they're legitimately and properly raised on appeal, assuming they're jurisdictions? Yes, Your Honor. I agree with all of that. I had just understood Judge Timkovich's question to be specifically about the shortened timeline to forgiveness. Okay. Sorry. So as an initial matter, the text does provide for forgiveness in the way that I described. And every iteration of the… And actually, my question is broader in general forgiveness of the debt at the end of the shortened timeline. Okay. So step back for a moment then and talk about all three of the provisions. The text specifically provides the secretary will determine the income of the borrower on which payments will be made. And every secretary to promulgate one of these plans across five administrations has determined that it is appropriate to protect a percentage of the borrower's income and then base payments on the remainder of the income. That follows straightforwardly from the text granting that discretion to the secretary. Are there any limits on that? I mean, could the secretary define the income that's available for calculation of the payment so low as to virtually no one has any payment? I think that would be difficult to square with the statutory requirement that it be based on… Okay. So where's the line? I don't know that there's a specific numerical threshold. And Congress didn't provide for a specific numerical threshold in contrast to other plans where it did. Instead, Congress asked the secretary to set an appropriate amount and invested the secretary with discretion in determining that, provided the secretary could offer a reasoned explanation through the normal rulemaking process. And so I don't understand that the states here have challenged that the secretary acted arbitrarily and capriciously, for example, setting the protected income threshold at 225% of the federal poverty line. In any event, that was based on an analysis of where borrowers struggle to make their utility payments or perhaps struggle with food insecurity. Nor do I understand them to have made a similar challenge with result to the 5% of discretionary income with respect to undergraduate borrowers, which was based on the fact that those borrowers were still defaulting or going into dealing with… Under your legal, and coming back to Judgment Q, under your theory of the case, those are merely prudential judgments by the secretary. The 5% could be 1,000%. The 10 years could be 5 years, 1 year. Are those prudential judgments that we have to defer to? Those are judgments as well. The time for a repayment has to be an extended period of time, is what Congress provided. And again, the secretary explained here why for some low-balanced borrowers, as few as 10 years would represent an extended period of time. But I think that ultimately, all of these are based on the same understanding of the statutory authority, which is to set payments in this formulaic way that I have described, and then forgive the remaining balance that every income contingent repayment plan has embodied. The statute doesn't use the word forgiveness, I don't think, does it? No, Your Honor. It simply says you should take into account, you should make special plans for economic ability to pay. That's not a quote, but that's the essence of it. There's no magic words requirement. Congress was not required to use any particular formulation to express its intent to have loan forgiveness at the end of the year. The consequence here, like in Missouri v. Biden, is that the consequences of the final rule would be a mass debt cancellation program. So that seems presumptively to fit within the Supreme Court's major question doctrine. Really, the issue for this panel is whether the statute clearly stated enough that we could basically authorize $450 billion in debt cancellation. So do you disagree that we start with the major question doctrine and then see if the statute permits it, or are you flipping it somehow? I think Your Honors can either assume the major questions doctrine applies and still reach the conclusion that the statute clearly authorizes this, or Your Honors could conclude, as we have argued, the major questions doctrine doesn't apply here. Does your department take the position that this is a major question or not? This is not a major questions case. How does it differ from Missouri v. Biden? That seems inconsistent. If that was, how could this not be? This is a bigger program, same outcome. No, Your Honors. Is Your Honor referring to Nebraska against Biden, the Supreme Court case? Yes. So Nebraska reached that conclusion after considering many different factors, and one among them was past practice under the statute. And the Supreme Court explained that what the Secretary's plan there did would be unprecedented. It looked at the past waivers and modifications under the HEROES Act and saw that this program would be a completely different one. That's in stark contrast to the situation here, where the states have conceded the legality of the pre-existing income contingent repayment plans. And this income contingent repayment plan is based on exactly the same statutory authority. Is there any Supreme Court case that found major issue strictly on the basis of the amount of money economic impact? No, Your Honor. There is no such case. No Supreme Court case to that effect? There is no Supreme Court case to that effect. Is there a 10th Circuit case that says that alone is all we need to look at? No. In fact, Bradford says the opposite, Your Honor. In Bradford, this court rejected the plaintiffs' reliance on the economic impact of the contested agency action alone, which the plaintiff there asserted was sufficient to trigger the major questions doctrine. Again, this court considered the full range of factors, which among them include whether this is an assertion of newfound authority, which the state plan is not, the past practice under the statute, the agency's expertise, all of which support the Department's position. Do you think cost could never be a factor alone under the major question doctrine? I don't think it could never be a consideration. I think the Supreme Court has thought of that as one of the considerations, but I don't think it is an overriding consideration. And on the cost piece, I don't think— How do we weigh these four factors? They're not equal. We don't put them on a scale and measure them. One is that the second one, enormous and transformative, dominant. And while we're talking about that, I think we almost have to agree it's enormous. But the phraseology from Bradford and Utility Air Supreme Court is enormous and transformative. So let's assume it's enormous. I think there's a question about whether it's transformative since debt relief has been granted right from the very beginning. What is your position on that? It is not transformative for exactly the reason Your Honor identified. These features of income contingent repayment plans have been consistent across three decades. They were interpretations that were issued contemporaneously with the enactment of the statute, which Loper Wright teaches us is entitled to significant weight. The same is true in Justice Gorsuch's concurrence in West Virginia. And so I think the fact that the Secretary has offered a consistent interpretation of the statute, and this plan is simply based on those same features, means that this is not of a piece with the major questions. So the department then, in principle, could wipe out all student debt, right? No. Is there any limitation? Yes, Your Honor. An extended period of time? The extended period of time and payments must vary based on the appropriate share of the income of the borrower. And, again, those will require reasoned decision-making and explanation of why the Secretary is making those judgments. If it wasn't reasoned, would the attack be under the APA that you're not using the Procedures Act properly? Would the argument be if you just said all debt out, they would say that's just an irrational and arbitrary decision? Yes. I struggle to see how that would be consistent with the statute or consistent with reasoned decision-making under the statute. I see my time is running low, and I'd like to reserve a few minutes for rebuttal. Certainly. Thank you. All right, let's hear from Mr. Nielsen. Thank you, Your Honor. Aaron Nielsen, may it please the Court. My colleague, Jake Beach, is with me at counsel's table. So the SAFE plan is essentially the HEROES plan, Part 2. Now, like most sequels, it's worse than the original. It's worse because it's a lot more expensive. It's also worse because the legal basis for it is much weaker. And I say this with some hesitation. I've taught administrative law for 10 years. I have never seen a more flagrant violation of the APA than what has happened in this case. Is that an issue before us today? Yes, Your Honor. The APA. Yes, it certainly is, Your Honor. Abuse of discretion. Correct. You have two grounds for why you say it violates the APA. One is that they didn't give enough appropriate time for notice and comment. Yes, Your Honor. Do you have any authority that said they give 30 days, right?  Yes, we do have. I mean, there's nothing in the APA that requires more than 30 days for notice and comment, is there? We have Prometheus Radio from the Third Circuit, which said 28 days wasn't meaningful. We also have the Lifeline Program from the D.C. Circuit, which said 14 days. But the one I would like to focus on, which I'm happy to discuss. I don't want to cut you off, Your Honor. But the one that struck me as the most egregious that I have ever seen is they said in the final rule that we are confident we are going to prevail in Nebraska. So we don't need to calculate the costs if we don't prevail in Nebraska. But they had already lost in Nebraska. The final rule was issued July 10, 2023. The Supreme Court decided in Nebraska June 30, 2023, 10 days earlier. That is a flagrant misstatement of a material point in the final rule. How many borrowers covered by the HEROES Act would also be covered by the SAVE plan? If we were doing a Venn diagram, how many people that lost out under HEROES because of Nebraska would kind of have their forgiveness saved under the SAVE plan? I don't know the answer to that. That was brought to the Department's attention during the notice and comment process, and they didn't put it in the final rule, which goes to my point why this is arbitrary and capricious. We do know from the Wharton model that the Supreme Court used in Nebraska that if you don't account for Nebraska in the end of the HEROES Act, this program becomes three times more expensive. So I don't know the exact number, but I assume it's got to be millions of people to make the program become three times more expensive. Could you address the two jurisdictional questions that we've bounced around? One is whether we have jurisdiction. Is there any meaningful relief we could give in light of the Eighth Circuit case as opposed to just advisory opinion? And number two, is there a case or controversy if, in fact, there is no legal right that the states can assert since there's always a right by the students to change financing terms? Yes, Your Honor. As to the first question, I don't think there's anything this court can do so long as the Eighth Circuit's injunction is in place. Whatever this court says and does, as we said in our letter to the court, nothing changes. So it would be an advisory opinion? Essentially. I don't know if maybe it's a jurisdictional matter if it is in the technical sense, but in the real-world sense, it would do nothing. And that's why as soon as the Eighth Circuit issued its decision, I wrote a letter to the Supreme Court and said, so long as this injunction is in place, we don't need emergency relief from the Supreme Court. If the Supreme Court grants relief to the department in the Missouri case, then we're back in action. Yes, Your Honor. And we told the Supreme Court that if they're going to grant the United States its application, that makes our application that much more important because then the only thing stopping, even under their view of the scope of the injunction, would be this court's stay on the district court's injunction. And the Supreme Court's done nothing with the application in this case?  Correct, Your Honor. I assume that when the Eighth Circuit issued its administrative stay more than a month ago, the Supreme Court said, let's see how that plays out before we decide what to do with our application.  But the Eighth Circuit also only – once we get out of the Supreme Court and we get back to what the Eighth Circuit has done, the Eighth Circuit has not granted the full degree of relief that is being sought here. Correct, Your Honor. It still would be, at that point, I think once the stay is resolved as to the one issue or the limited issues in the Eighth Circuit, we would then have a case or controversy again. Yes. I mean, I don't want to fight too hard because I think it's helpful to us because we like the Eighth Circuit injunction. I don't think there's a lack of a case or controversy in front of this court because there's always a possibility. What kind of relief could we give today? Well, we urge broader relief than the Eighth Circuit gave. We think the entire rule should be vacated, whereas they left in place the ancillary provisions. But you don't identify – and even in your request for relief, you don't really identify what these ancillary provisions are, how they are relevant to anything while the Eighth Circuit injunction is in place. Correct, Your Honor. So the ancillary provisions are the ones that the United States talks about at the end of their brief. And our point is, under the APA violation, all of those are unlawful and will have to be set aside. But they're irrelevant so long as the Eighth Circuit injunction is in place. Practically, yes, Your Honor. As to your second question, I think it's very important. The case I would urge this court to look at is Wyoming v. Oklahoma from the United States Supreme Court. There, Wyoming sold coal. Nobody had – Wyoming had no legal right that people were going to buy Wyoming coal. Oklahoma then had a different program that made people stop buying Wyoming coal, and the Supreme Court said that's a case of controversy, which I think is totally on point with Your Honor's question. How could they do that? How could they decide that? Well, I think – Because it's an intervening act by independent people, and they don't – and Wyoming didn't have any right. I mean, I haven't read that case, but the way you're describing it just strikes me as odd. You know, with some evidence, I don't think it's odd at all, and the reason why I don't think it's odd is I thought about it as this. We know, going back to Hammurabi's code, that interest has been part of the lending industry. Right. They will lose interest. We all agree on that, but they don't have a right not to lose interest because they've got a habit or a practice made, but they don't have a right not to lose that interest since every buyer has the right to walk, to change, pay off, or to leave or to refinance anytime they want. I mean, the implications of that position – They don't have a legal right. Would be extraordinary because it would mean that – Imagine that the administration said, we're going to pay off everybody's balance of their credit cards for the entire country, no legal authorization whatsoever for that. The entire credit industry would collapse. That's true for all the finance industries which rely on interest, and to say that there's not even a procedural injury that's such that they couldn't file comments in a notice and comment period would be truly extraordinary. The other side of the coin, though, is that you're really arguing that the federal government is essentially stopped from offering more attractive financing programs now or forever in the future because any program they offer that might be more attractive could cause people to leave an old program, and that's almost like saying federal estoppel, which we know can't happen. Nobody's using those phrases, but you're saying basically that there's going to be a legal obligation to you if the federal government comes up with a new, improved version of anything if it means that people aren't going to use the old version anymore, and I just don't see how the government can run with that kind of a burden over them. If I'm saying that, I apologize. That's not what I'm trying to say. I am saying that there is Article III standing because there is an injury. Now the question we get to merits – the district court opinion, your own briefs have said that. I guess I would be telling your Honor, consistent with the Supreme Court decision in Wyoming v. Oklahoma, which I think, again, just resolves your Honor's concern, you have a common law right if you are an insurer, a lender of money, that you're going to get your interest. If your contract, though, says you loan me money and we agree to a contractual term that says that I can pay it off in full any time I want without penalty, you don't have any legal injury if I pay it off in 30 days without paying any interest. And the pushback I would have, again, on that, your Honor, one, again, I'm going to lean on the Supreme Court. I think Wyoming v. Oklahoma resolves that concern. But second, that really would mean that the United States could pay off every credit card of anybody or pay off every house of anybody completely lawlessly, based on any statute, and nobody could sue, even though it would destroy the finance industry of the United States. So are you saying that there's a business model here that assumes that only some percentage of borrowers will prepay the debt, and that there's an underlying assumption that the model works because not everybody does? Exactly. And so are you saying that because they incentivize and accomplish the prepayment, how does that generate the injury that Judge Edel is looking for? Exactly, your Honor, that's how this would work, is the model does not work if everybody pays off early, which, again, we said in our briefing, how do credit cards work? The Federal Reserve says the only reason the credit cards exist is because people don't pay off their balance every month. So it would be destruction of the credit card industry. But as to your point there, and I think this goes to your point as well, your Honor, often it will be perfectly lawful for them to make a program that is better than what the states or somebody else can offer, and then people will go to that, and we will have no claim on the merits to such a claim. Here, the difference is this is patently unlawful under the Supreme Court's decision in Nebraska. And I want to just emphasize the major question doctrine here. The Supreme Court said in Nebraska it's economically and politically staggering by any measure. Staggering was the word that the Chief Justice used for both economics and politics. It has not become less staggering in the last year. If anything, the HEROES Plan was $430 billion. This is $475 billion. We know from Alabama realtors from the Supreme Court that even $50 billion is a major question. So the delta between the HEROES Plan and the SAVE Plan is itself a major question. So they need to point to some clear language, and the Alabama realtors case from the Supreme Court says exceedingly clear language. But there's no... This is important to me. Are you saying that based upon the Nebraska case and Alabama realtor that size alone will be transformative and sufficient? No, Your Honor. But what they said in Nebraska was they said economically and politically staggering. The Supreme Court already addressed Your Honor's concern about loan payment specifically, and they addressed... Sorry, Your Honor. I hope they got my point. I urge the court to look at the paragraph from Nebraska. Go ahead and answer his question and then judge me. But they say it's both economically and politically staggering. And they mentioned that in the single session of Congress, you know, there were scores of language proposals for loan cancellation that was enacted, and Congress said no. And they also quoted the language from Nancy Pelosi where she said the president can't do this. And they said this is politically staggering, not just economically staggering. I'm sorry, Your Honor. Okay, so to me it appears you're jumping over the first question is whether there's a case of controversy because there is an injury. There's a breach of a legal right, a loss of a legal right here. And I don't care how big it is, you've got to first meet that step before we get there. And in Biden versus Nebraska, the court relied on loan servicing fees, not interest. It's a different animal than what you're asserting here. And as Judge Ebell has pointed out, if you had an entity that was getting the servicing fees, it's one thing. But if you've got an interest loss that's based on exercise of a contractual term that gives these borrowers the right to pay off early without penalty, it's much more difficult to find the breach of a legal right there. I wasn't trying to skip over. I just want to make sure because I only have so much time that I can answer some of the questions about the Major Question Doctrine. Pat, can we go back to standing? Again, I think that Wyoming v. Oklahoma is dispositive. Wyoming had no right for anybody to purchase. Anything other than Wyoming versus Oklahoma. I mean, none of the cases on student loans help us. Not on student loans. But to follow the district court's analysis here, which I think is plainly correct, you can rely on California v. Texas that you can assume that people will enroll in valuable government programs. That's from the Supreme Court. We have clear findings of fact from the district court that that's what's going to happen here. So then the only question is this question about legal right, which of course is, I said, the basis of the entire credit industry of the United States. So the stakes are enormous if we were to adopt that view. And you don't have to adopt that view because the Supreme Court in Wyoming v. Oklahoma said there's an injury, even though of course Wyoming had no right that people were gonna buy Wyoming coal. Nonetheless, the Supreme Court still said that there's an injury. Does it matter here that there's not new state-supported student loans being issued? Not at all, Your Honor. Because? It doesn't because we still own them. We are still receiving the interest on them. And now we're receiving less of the interest because they're consolidating into the federal program. So that's, you know, pocketbook injuries against Ensar Berati. So another point that I want to emphasize, and I don't want to skip over, but the other point I'd like to emphasize is the limiting principle here. They don't have one. The limiting principle they have, they say it's appropriate. Well, that is not a limiting principle. And the case I would point to that, you know, the one that we cite in our brief is Mastretta, footnote seven of Mastretta, which goes back to the benzene case. That language there was, if anything, more expansive than the language here. The court said no. In our reply brief in this court, we cited the Sixth Circuit's case just a few weeks ago in net neutrality. Why isn't the limiting principle here 20 years? Because, Your Honor, they cut. They're shorter than 20 years. Yeah, but it is a limit. It happens to be a limit that is higher than what they're using. But there is a limit. Congress has put a limit on there. And presumably, if they said 20 is as long as you can do, I think that necessarily implies anything under 20 is okay. So, Your Honor, I mean, to push back, what could they do a week? That essentially would give everybody, and I take my friend on the other side, disavow that. Say, no, no, no, that wouldn't work. But the question is, why wouldn't that work? Well, the statute says an extended period of time. Why isn't that an enforceable limiting principle here? Well, what do they mean by extended? They've gone from 20 to 10, right? And so, you're saying it's 10, but not an extended period of time? Well, I thought we were asking for what is their limiting principle. Their limiting principle... I'm saying it's an extended period of time. Extended period of time, but could they not then go to five? Could they go to three? We'll worry about that. Let some other panel worry about that. My pushback on that, I hear it, Your Honor, and that's a temptation, but the Supreme Court of West Virginia said you can't do that. You need to look at the breadth of the power asserted to decide whether this is a major question. So, you can't just say, well, save that for another day. But, again, let's say I'm wrong about all of that. Let's say my major questions argument is wrong, notwithstanding Nebraska. Nebraska never happened. This still is the most egregious APA violation I think this court will ever find, and I didn't come clear to that in my briefing. I want to make sure. I want to stress that today. The APA violation is because they assumed they would win the Eighth Circuit case, and that's wrong. Is that the APA violation? The one I'm emphasizing right here, yes, and we know that that is a fatal error because the Supreme Court said so two months ago in Ohio v. EPA. The Supreme Court said there the EPA assumed that they were going to prevail in lower court decisions, not Supreme Court decisions, lower court decisions, and thus didn't prepare a workable plan in case they were to lose. They lost, and the Supreme Court said, to be sure, 5-4, but that's a holding of the Supreme Court. That is arbitrary and capricious. Here, it's even more than that because even under their best argument for why they somehow are okay, it's that they rushed to beat the Supreme Court out the door. What is going on here where we have agencies who are trying to evade decisions of the United States Supreme Court? That is a threat to this court. That's a threat to the judiciary, and the Supreme Court, I trust, will not stand for it. See Ohio v. EPA. Is the underlying problem, though, that because of that process, they underestimated the cost of the program, or is there something in addition to that that's at play? So in Ohio v. EPA, it was whether they could make the clean air programs work, and they had to have a certain number of states to rate a critical mass, and they assumed that they were going to get that, and they didn't, and even there they had, more so than here, they had a carve-out, what happens if we lose, which the court said that's not at all satisfactory. Here they didn't even have that carve-out. Here they just said we're going to win, and this is the part... But the implication of that assumption is that the plan tripled in cost, basically. Correct. And they knew it. That's the part that, to me, is the most astonishing. It makes this... And why does that violate the APA? Because you can only uphold an agency decision based on the reasons the agency gave at the time. That's Chenery. That's as black-letter law as administrative law gets, and that's also what they reiterate in Ohio. You can ignore the red for now until we're done. So that's the first thing. They have to look at what the reason that they gave. Here this program is three times more expensive. It already was a major question. Now I've seen this is the most expensive regulation of all time. I'm not sure that's right, but we're in the 99.999th percentile of regulations. If you're going to be in there, you need to know what the costs are. But the department says it doesn't have to consider costs at all. Correct, and that fails under Chenery. That's the point that I'm trying to reiterate. They didn't put that in the final rule. The final rule doesn't say we don't have to consider costs. The final rule says we're going to prevail. We're confident we're going to prevail in the Supreme Court, even though they had already lost in the Supreme Court. That is a black-and-white violation of Chenery. 1943, Supreme Court. There's a rule that, like I said, is black letters, administrative law gets, and they lose. But say I'm wrong about that. They surely, under appropriate, have discretion to consider costs. That's Michigan DEPA, which is also about the word appropriate. They had discretion to consider costs, so they'd have to explain why they are not considering costs, and they didn't do that either. So they either lose under Chenery, or they lose under Michigan DEPA. But if this was allowed, what is going on in arbitration review? Arbitration review no longer has any teeth at all. I'll give Mr. Brewer some time. I've gone over a few minutes. I know, but I do want you to address his key merits argument, and that is that the statute clearly authorizes loan forgiveness under an income-contingent repayment plan. Yeah, so again, remember, it has to be exceedingly clear, because we're in the world of the major question. They don't have any language that actually forgives loans in these ICR plans. Instead, they're relying on an inference about, well, what happens after 25 years? I don't know if that argument even works in an ordinary case after Loeb or Bright. That's a question of, if there's ambiguity, they've got to figure that out. But it's certainly not an exceedingly clear statement. And the other point, this is not a continuation of what they've done in the past, but the reason is explained by the district court. Never before now in any other plan have they gone beyond the numbers of the IBR plans. Now, what are the IBR plans? Those are the plans for people who have partial hardship, in other words, the people who are struggling financially. Congress was concerned about them, so when President Obama and the State of the Union said, well, let's make it more, let's help them, Congress helped them. This is more beneficial for everybody than what Congress said we're going to give to people suffering from financial hardship. They have never done that before in any plan, and this will be the very first time. That is transformative. I think it fails under ordinary interpretation. The specific governs the general, but it's certainly not a clear statement. Do you think the, if the department's been cancelling loans under ICR plans in the past, do you think that that's impermissible, that's illegal, even though they've been doing it? Yeah, that's the point. I'm not quite sure. The Eighth Circuit essentially says that that's always been unlawful. I think under Loper-Bright, that might very well always have been unlawful. Remember, they decided this in 1994 when they first did this. This is well in the age of Chevron, so they could do that. We're not in Chevron anymore, so I don't know if that works. But I do know that this is, you know, orders of magnitude larger. The repay plan before now was the largest. That cost the United States $15 billion. We're now at $475. The pay plan and the 1994 plan, these were essentially cost neutral. So we have one time where they go over a little bit and cost the United States $15 billion, and they say, well, from that we can cost the United States $475. One last question. I'll ask this for Mr. Brewer also. If the final rule is enjoined, which it is in the Eighth Circuit, does the replay plan spring back into action, or are we in a legal limbo until we get merits decisions from this court, the Eighth Circuit, and the Supreme Court? I think we're in legal limbo, and that's to go back to my arbitrary depreciation point and the point about the notice period. If they, and again, I don't want to fault them too harsh. I don't know what was going on internally, but if they wanted to do it right, what they would have done is they would have, one, anticipated and addressed what happens in Nebraska, and two, they would have had a fallback. What happens if a court says this is unlawful? What's the remedy? They can do that in the rule, and if they had thought it through, they would have said, well, if that happens, we go back to the repay plan, but they didn't do that, which I think is, I mean, almost the most irresponsible thing I have seen an agency do, because you have millions of people who depend on it, and rather than looking after them, they said, what we're going to do is we're going to take a legal risk, and they're the people who are going to bear the risk, are not the agency. It's the people who are now stuck in forbearance because they didn't anticipate Nebraska, even though Nebraska had been decided before they issued the final rule. So the net effect of the Eighth Circuit's stay is, and you can confirm this, is that the borrower is in forbearance until further notice. That's my understanding of what the department is doing. Do you have any other questions for the state? So many. Well, we have all the time in the world. I think we're still hearing from one more person, but I do think we've had very, very helpful arguments from both of you. Do you have any further questions? Okay, thank you. I know I've gone over. I really appreciate it, Your Honor. We ask the court for broad injunctive relief. Thank you. And why don't you give five minutes for Mr. Brewer? Thanks very much, Your Honor. So I want to start with the case or controversy question. I didn't understand my friend on the other side to be saying that this case is moot because this Eighth Circuit issued an explicitly temporary injunction pending appeal. And so I don't think that there's a case or controversy problem with the fact that the Eighth Circuit has issued a nationwide injunction. But even if I were wrong about that, there would be no problem sequencing jurisdictional issues. So this court could still hold that there is no standing for the states and vacate the preliminary injunction on that basis, even assuming there were some other jurisdictional question about the effect of the Eighth Circuit's order. I'm confused. Why is standing out of privileged position here? Standing is a core Article III jurisdictional issue. And the Supreme Court has been clear that jurisdictional issues can be tackled in whatever order is appropriate under the circumstances. So I think it would be, in the circumstances here, appropriate to vacate the preliminary injunction based on lack of standing. But Article III case or controversy is also a core jurisdictional issue. Undoubtedly, Your Honor. And so if we don't have any power to do anything, so long as a universal injunction is in place, we don't have a case or controversy. But that would be equally true for lack of standing. And so because those both go to Article III power, assuming that the Eighth Circuit's order really does sound in mootness or something like that, it would still be appropriate to address standing here. The second thing I want to address is my friend's argument about the cost of the rule. It's not the case that the effect of Nebraska is simply to triple the economic impact of the SAFE plan. And that's because the Penn-Wharton model that they now rely on is based on fundamentally different data and assumptions than the Department's estimates here. So it's not appropriate to just assume that the costs will triple. If you look at the CBO estimates, for example, the ones that they cited in their complaint in this case, the costs increased by about 20% when accounting for the effects of Nebraska. Well, did you offer any alternative costs in your briefing? We pointed to the CBO estimate in our brief, which, again, was cited in the plaintiff's complaint. So it's appropriate. The Supreme Court did rely on the Wharton model, though, didn't it, in Nebraska? The Supreme Court relied on the Wharton model in Nebraska. But there's a CBO, which is a more official estimate available here. But even if it doesn't matter whether or not the court needs to pick one or the other, the point is just that there's no reason to assume that the costs are going to triple in the way that the states do. I mean, I think it's fair. We can assume it's a big-ticket program. The question is whether costs are even relevant. Undoubtedly. I think you're saying that whether it's triple or a third, that really isn't relevant. That's right, Your Honor. And that was the next point I wanted to make, which is that, again, even assuming that the Department erred here in all of the ways that the states have asserted in assessing costs, you have not heard them assert any prejudice based on the cost estimate. There's not a word about prejudice in their briefs. There's not a word about prejudice in argument here today. And the rule of prejudicial error is a fundamental aspect of APA review. And there's no prejudice because the Secretary was going to do it anyway, no matter what the cost? There's at least no reason to believe that if the costs were spread across two agency actions rather than one agency action, that would change the Secretary's decision about whether or not those costs were worth it. So I don't think Your Honors need to think that the Secretary would do this no matter the cost. But their argument is that because the costs were attributable to one action rather than two, that that might have led to a different outcome. And there's simply no basis to believe that in the record. I'm confused about that. It may take more time. But I don't understand the one versus two action point that you're making. The state's theory is that the plan became more expensive because of the invalidation of the HEROES Act debt cancellation in Nebraska. And so the states say the department failed to account. OK, I understand. And that is true, though, isn't it? It did become more expensive. It did become more expensive. So some costs shifted from that prior agency action to the second agency action. I didn't know what your two were. And now I do understand it. Thank you, Your Honor. And so there's no reason to believe that simply because some costs shifted from one agency action the Secretary previously deemed appropriate to another one which he deemed appropriate, that he would reach a different conclusion. So I'm trying to make sure I'm understanding. So your argument is there was no net change in the cost. It was just whether it fell under one statute as opposed to the other statute. That's the state's theory, is that some costs were shifted from the HEROES Act forgiveness to this plan. And whether or not it's attributable to one action or another that the Secretary had taken, there's no reason to believe that there would be prejudice or that the Secretary would reach a different decision. And is it also your position, I think Judge Timkovich said, that that cost was irrelevant to the Secretary in making this decision? It's our position that the Secretary was not obliged to consider costs under the statute. The Secretary, of course, laid out an analysis under the executive orders, which create no private right of action, and plaintiffs are not allowed to enforce under the APA. And in that vein, the Department responded to comments about the cost under those executive orders. But that's not part of the arbitrary and capricious review. The third thing I'd like to address is about the IVR statute, the income-based repayment. So income-based repayment did not exist when the Secretary promulgated the first income contingent repayment plan. So it's a little strange to say that the Secretary has never before gone beyond the parameters of the income-based repayment program. That aside, there are reasons that Congress may have specified more particular parameters in that latter statute, which is that income-based repayment is available to these federal family education loans, as well as department-held loans. And so Congress may well have judged that the Department should have more discretion in setting the terms of repayment for loans exclusively held by the Department compared to these loans that were held by private lenders as well. That sounds like they made a clear statement. For those plans and for the income contingent plans, we have silence. So how do I infer a clear statement under major question from their silence? Again, Your Honor, I don't think there's any requirement that Congress use magic words in the fact that it used different language in two provisions and acted at different points in time where there is no textual indication of exclusivity in the income-based repayment provisions. I don't think that supports the kind of negative inference that my friends on the other side are trying to draw. You can turn off the clock. I had a couple other questions. Are the borrowers in legal limbo forbearance until the Supreme Court does something with this case? So all of the borrowers who are enrolled in the same plan? In other words, repayment doesn't spring back into action, does it? Under the terms of the Eighth Circuit's injunction, it seems not to. It seems that they are in limbo or they are not. It seems that they are currently in limbo under the terms  They're not making any payments right now. That's right. At least they're not legally obligated. Because they're in forbearance. Is interest still accruing? I believe interest does accrue under the term. Excuse me, sorry. I believe interest does not accrue under the terms of the forbearance. And then Mr. Nielsen mentioned Wyoming versus Oklahoma on the standing piece. Do you have a response to that case? That is a tax revenue theory case. So the theory was that there was an impairment of the state's right to collect tax revenues, these specific coal tax revenues. And we've explained why that's in opposite to their tax revenue theory in our briefs. But the states have never pointed to any case holding that there's an Article III injury based on repayment in full of a loan. And I think, again, that would be a truly extraordinary proposition. Didn't South Carolina have a tax revenue standing argument? They do. And that argument fails for the reasons explained in our briefs. South Carolina's choices about how to structure its tax code are attributable to them, not to the Department. And they relied on the federal definition. Is that the argument there? That's right. They had just adopted it. And that was their choice to do so. There is nothing in either the federal tax code or any action by the Department, of course, that obliged them to do that. So you're distinguishing Wyoming v. Oklahoma because here there is no, at least, assertion of standing based on tax. There's no assertion based on standing for Texas and for Alaska, which have no state income tax. And South Carolina's tax arguments fail for the reasons explained in our briefs. Because they chose to regulate it in a form related to where they did. The Supreme Court's decisions in Pennsylvania established that principle. And its decision in the Federal Election Commission against Cruz reaffirmed that principle. I'd be glad to answer any other questions the panel may have. Hearing none, thank you, counsel. You're excused. The case shall be submitted. We appreciate you coming to Denver. And we appreciate the fine arguments.